We'll turn to the first case on the day calendar, USA v. Jacques Durand. Good morning, your honors. May it please the court, Malegre Glashauser representing Mr. Durand. Mr. Durand's questioning here was not routine. It was not part of an administrative procedure. It was not during processing. It wasn't in anticipation of booking. When was he actually booked? Three months later. For the federal charges? For the federal charges. When they left him, he was arrested by the postal inspectors, right? He was picked up off the street by the postal inspectors and brought to their federal inspection office, and then after the interrogation without Miranda, he was brought to local authorities. They didn't book him then? The local authorities? I don't know exactly what happened by the local authorities, but the federal inspectors when they were interrogating Mr. Durand were not in the process of booking him. They were just interrogating him and failed to give him Miranda rights. I did see there was a reference somewhere, I forget where it is now, but that there was a pending state prosecution against him at the time that was referenced, I think, in the report of the interview by the postal inspectors. That's why they took him over across the street, but you don't know what that was or what happened the rest of that day, whether he was actually brought in and booked on the state charges or he'd been booked earlier on some charges, do you know? I believe that he was processed by the local authorities that day, but there are no facts in the record. What do you mean processed? He wasn't booked? Your Honor, I don't believe the record is quite clear on what happened in the local court, but what is important when Your Honors are looking at what happened during the questioning is what the federal inspectors were doing. There's no indication here that the federal inspectors were asking Mr. Durand questions in relation to a totally different jurisdiction's booking process. I found what I was thinking about. It's in a criminal complaint that was filed in September in the federal action. It says, paragraph 10, Honor, about June 9th, 2015, which is the date of the interview, Durand was arrested in connection with a criminal matter pending in the Nassau County First District Court, but you don't know anything more about that. I guess I have to ask the government what that was all about, whether it was in connection with this case or something else. Well, it certainly wasn't this case. The two jurisdictions are separate and I think that matters here when considering what the federal inspectors were doing. They weren't doing any sort of standardized federal booking process and they weren't doing any state booking process either and that's different than all of the cases that I've found where this circuit, or indeed any of the cases that either of us have cited, rely on a routine booking exception to Miranda. And that makes sense. The cases that rely on that exception note that the interrogators, the agents, are going through a standard form. They're asking questions just in the order of the form. There's no indication that they're doing anything than filling out arrest processes. Would you agree that if he was being processed by the two inspectors at that time on June 9th, these were appropriate questions, including what's your phone number and if that phone didn't work, we'll try another phone? If they were really booking him, isn't this pedigree information? I wouldn't agree. I wouldn't agree for a few reasons. First, even when somebody is going through a formalized booking process, if the agents are actually asking questions for an investigative purpose, that still is interrogation under Miranda. And that's clear from this court's decision. And Rosa, and really I believe all the decisions, just because it's a booking process, the agents can't ask questions that they know in this particular case will elicit incriminating answers. There was a moment when they tried the phone, it didn't work, and they said, tell us your real number. They were acting in an investigatory capacity, not an information gathering. That's correct, Your Honor. These agents knew through their investigation that phone numbers were crucial to their case. And they knew that what Mr. Dran said in answer to that question could be crucial to their case. And when looking at the facts of what happened here in this interrogation, it has all the hallmarks of a regular interrogation. They accuse him of lying. They confront him when they don't believe his answers. And they keep asking him questions until they get the answer that they are looking for. What if we agree with you? What do we do? We send it back for a suppression hearing? No, Your Honor, you can find on these facts where it's clear that no Miranda was given. And that if Your Honor agrees with agrees with me that it was interrogation, custodial interrogation, then his statement should be suppressed. The conviction should be reversed and it should be sent back for further proceedings. We could make that decision, which presumably would involve evidentiary determinations. You want us to make that decision? As opposed to sending it back for the district court to make appropriate findings? That's a decision that you're appealing, right? The district court's refusal to suppress. That's correct, Your Honor. But how do we do that? Judge Cabranes asked. We don't know. I saw in the testimony one of the inspectors at trial that he thought there were five or six phone numbers at the time that set off alarms during the interview. But even though it's an objective test, we don't really know much about how many phone numbers they had, whether this was one of the phone numbers, whether they actually filled out any forms at the post office that had pedigree information. Wouldn't that be relevant to whether it should be suppressed or not? We do know the answers to those questions Your Honor just articulated. This phone number was on the list and they were not filling out a form. We have the information that they produced in relation to that interrogation and it is not a form. So if Your Honors find that Miranda should have been given because either this wasn't booking or processing and there's no evidence that it was and or that they were asking questions that were investigative in nature, then his statements must be suppressed. No Miranda was given. But what if they had gotten a pedigree form from the state court across the street, the district attorney's office or the county sheriff's office, county police office and they were just filling out the form? Wouldn't that be handing it over to the county detectives or something like that? Wouldn't that be relevant to suppression? It might be, but that's pure speculation. There's no evidence that happened here and we're not working with no information at all. I think we have a lot of the information. We know how the interrogation went because the agents testified at trial about what happened. We know the forms that they filled out because they were attached to, excuse me, it was a report of interview form that they filled out because it was attached to the defense attorney's motion to suppress the evidence here. We're not missing facts about the processing and also the government had the opportunity already to introduce any facts they thought were relevant to the district court's determination about whether this was processing and they failed to do so. They just say it's processing but point to no facts at all that indicate that Mr. Durand was booked or processed and as Judge Pooler points out, he wasn't booked or processed by those authorities for three more months. The other thing that makes this case different than the cases that this court and others have found are under this exception is that the agents here should not have been surprised at all by the incriminating nature of Mr. Durand's answers. This is not a situation where an answer that seems innocuous is later found to be incriminating because they knew phone numbers were crucial and the other cases where the exception applies rely on this element of surprise. For example, one of them that the government relies on, Rodriguez, the questions actually weren't incriminating until the person later returned to the country using a fake name. Then his previous answer about his real name became incriminating. That's not only a surprise but it just wasn't incriminating. You would argue in the words of I think the Supreme Court that this question was designed to elicit an incriminating response under the guise of asking a pedigree question. Is that your argument? It's part of my argument, Your Honor but also it's not pedigree because they're just not doing a routine processing here. This was just interrogation and when Mr. Durand is read his Miranda rights, he exercised those rights immediately. You're asking that we reverse the decision not to suppress and then send it back to the district court for further proceedings consistent with that decision. Correct, Your Honor. The government could decide to retry him or not. The court can decide to, I don't know, I suppose that's not our decision. That's up to the district court. That's correct, Your Honor. Well, what has been the results? So where does the case stand right now? Mr. Durand is incarcerated. Is incarcerated pursuant to a sentence imposed by the district court, right? That's correct. For how much time? 51 months. 51 months. So assume for the argument that you're successful. And fully. And the government decides to prosecute Mr. Durand because of course the slate will have been wiped clean, right? What jeopardy is he in at that point? Does he not run the risk of a more severe sentence? Certainly a new sentence if he's convicted, right? What I'm getting at is very simply this, Ms. Glasshouse. Yes, Your Honor. Have you discussed this case with your client as to what can happen if he has this spectacular victory before the Court of Appeals? I always discuss my cases with my clients, Your Honor. And I don't think that the concern... He knows that he runs the... There's a risk that he may be tried upon remand. Well, he was tried already and sentenced. So I'm not sure what the concern is that it will... What is it that you want from it? Let's go back to find out what it is you want from us. You want us to reverse and enter judgment for him. On the suppression. On the suppression issue. Yes, Your Honor. No, no, no. I'm talking about the judgment of conviction. Right. Reverse the judgment of conviction. That's right. So it's not just a question of reversing a determination with respect to a search. You want us to enter judgment for him. And therefore, he prevails altogether. Well, no. He would still face possible retrial. Well, that's... Yes. Oh, sorry. That's my point. We go back full circle. He faces the possibility of retrial, right? Correct, Your Honor. But without the statements... Why is that good for him? Maybe you can give us a general explanation of why a criminal defendant should deeply desire to be retried. Well, because right now he is serving a sentence of 51 months, Your Honor. And you think that if we reverse, that he's going to prevail at this putative trial? The information that was taken from this interrogation, in the government's words, cracked the case open. So the statements we're talking about suppressing aren't some small ancillary thing. They are the crux of the case against them. Your view is that it's highly unlucky that the government would pursue another trial. I don't... I would not speak for the government. But Mr. Drent's chances of success in future proceedings without his un-Mirandi's interrogation are dramatically different than his chances were originally. Right. Okay. Great. Thanks very much. Thank you, Your Honor. So what, in your view, is going on here? Good morning, Your Honors. My name is Matthew Higgins. I represent the United States in this case, and I prosecuted the case at trial. I believe the question presented for this court is the same question that confronted the postal inspectors on the date of the June 9, 2015 arrest, which is, did they know, or should they have known, that the content of their questions was reasonably likely to produce an incriminating response? Once they try the first phone and it doesn't work, it seems to me they have changed their mode from gathering information to investigatory. I don't believe it means they've changed their mode from a pedigree gathering exercise to an investigative exercise, Your Honor. However, the encounter did not start with the question about the phone number. The encounter started with much more basic pedigree information, and the officers on this record, as both officers testified at trial, had an increasing concern that the defendant was being misleading and uncandid about his pedigree information. He was reticent to provide his social security number, although he confirmed it when the officer said, we think this is it. Is this it? So you feel that the fact that he's reticent on some things that we all agree are pedigree information gave the postal inspectors the right to investigate further his answers? Under this court's holding in Rosa v. McCrae, Your Honor, the officers have a duty to press upon responses that they believe are either false or unreliable. In that case, the circumstances presented were somewhat similar. The same officers who were responsible for the underlying investigation, which in that case I believe was an assault, were the officers conducting the booking interview. So they had the knowledge in their heads of what the nature of the case was. Can we all agree that this wasn't a booking? This wasn't an interview leading to booking? No, Your Honor. The government contends that it was. When did the booking take place? It happened immediately after this interview. He was booked where? By whom? He was booked in Nassau County on state charges. This was an investigation overseen by the Postal Inspection Service. The arrest was undertaken by officers of the Postal Inspection Service and Inspectors McKechnie and Belfort had principal responsibility for the investigation. Was he arrested on state charges? He was arrested on state charges. He was booked in Nassau County that day. Do you know what the state charges were? I believe it was related to credit card fraud, a grand larceny charge under the New York penal law. I do not know the exact statute under which he was charged. However, that case was ultimately, I believe it was ultimately dismissed in deference to the federal prosecution. When he was booked across the street, did they do the pedigree form information? I do not know the answer to that standing here today, Your Honor. He wasn't arrested on the federal charges until September, right? The federal charges were not filed until September, Your Honor. And the federal charges also encompassed charges that had neither been filed in state court or could not be filed in state court. For example, the defendant was ultimately indicted on an aggravated identity theft charge, which to my knowledge is not available in the state court. When was he formally Mirandized and by whom? By which agency? He was Mirandized by the Postal Inspectors at the conclusion of the pedigree portion of this interview on June. Then he was asked to speak to a lawyer. That's correct, Your Honor. We may assume that he might not have given the telephone information if he was Mirandized before that. I think this court could assume that anytime a defendant is Mirandized, they will decline to provide additional information. And this information was so crucial, as opposing counsel said, it broke the case wide open. I believe there is some nuance to that, Your Honor. It's clear on this record that the identification of this telephone number and its association with this defendant was an important development in the case. Well, you said in your summation, didn't you, that it broke the case wide open? Yes, Your Honor. The association of this telephone number with the defendant absolutely did constitute a very important development for the strength of the government's case. However, that association was available to the government by alternative means. The defendant was carrying the same wireless device, the cellular telephone, in his possession on that. Are you arguing eventual discovery? That is one of our arguments, Your Honor. I didn't make that argument below. Didn't you waive that argument? The argument was not made below, in large part, because it was not necessary, as the district court granted. It denied the defendant. Prudence might have. You knew that this was a case seeking suppression. Prudence might have argued for you to argue eventual discovery below. You can't make an argument for the first time to the Court of Appeals. This court has the authority to affirm a judgment on any decision, excuse me, on any basis presented in the record and the search warrant under which the device in question was ultimately searched. This same telephone number was identified, was part of the record below. It was part of the discovery. The government, at trial, introduced both the device and the limited result. I understand, but if it were not for an over-eager postal inspector, you would have, in the fullness of time, gotten your search warrant and found information about that phone. He asked for the number in advance of Miranda warnings given to this defendant. You never made the argument about eventual discovery before the district court. Your Honor is correct. The record does not contain that argument before the district court. However, the government does not believe the postal inspectors were over-eager here. The government believes the postal inspectors were within their authority under this court's decision in Rosa v. McRae and similar decisions in which the officers are entitled to press an arrestee when the booking information provided to them appears to be unreliable. In that case, it was the defendant's, the arrestee in that case, it was his hair color. The officer said, what is your real hair color? It ended up being a very important item of identification information that corroborated the statement of the witness, the victim in that case. This case is at least one dimension removed from that in the fact that the officers did not ask, is this specific number your telephone number? They did not ask from this list of six or seven or eight telephone numbers that are relevant to the various credit card . . . But they asked, what is the number of the phone you're carrying? They knew if they needed it, that they could get a search warrant for that phone because they had the phone in their own possession. What was the rush to get him to identify the phone? That's the very purpose of Miranda, to keep defendants, potential defendants, from giving information that is harmful to themselves without being warned of the consequences. The only reason it got to that point, Your Honor, is that the defendant provided a telephone number that was a non-working number. I understand. I understand. That's when it turned investigative in my view. There's no holding of this court, and I'm not aware of a holding, that requires the officers to be continuously on guard for when any question might conceivably start to trammel into potentially incriminating information. The officers, the inspectors in this case, did not have a particular basis to believe that the device was assigned a number that would end up being so important, any more than the officers in Rosa had a basis to believe that the hair color would end up being so important, or that in other cases such as Hines or as Gatchis, that marital status or employment would end up being so crucial. I would also add that identification and attribution of particular statements, particular devices, particular social media accounts in this day and age is a part of almost any criminal case, and a holding that requires officers to refrain from asking these types of questions in the booking context as this was, potentially creates an issue where officers are unable to ask any questions that might go towards identification. Ask traditional pedigree questions. That's what the rules have been, and it's only the district court, case that Judge Glasser cites, which included telephones anyway in what is traditionally viewed as pedigree information. That was an outlier case when he decided it. We haven't decided it, our court, and no other district court has followed that. . . . . I see my time has expired.                                    precedent, but if we look back at some of the factors, at some of the questions that were deemed necessary as pedigree information, either because of a need to contact the defendant, a need to identify associates of the defendant who might be able to vouch for them at a bail hearing, a need to identify the defendant's ties to the community, marital status, employment, address, a cell phone is at least as relevant to those queries to those issues as those same queries were. I'd like to ask a question, and that is one I think you knew you were going to get, which is, you said before the district court a couple of times, I think we need a hearing here, and there was no hearing. How do you feel about that now? I mean . . . The government was, I think, clear on this record. The government was prepared to hold a hearing on . . . You said the court may need to hold a hearing on this. The court would have to hear testimony from officers to address it. You're familiar with that? Yes, Your Honor. Should there have been a hearing? Clearly, I was prepared to have a hearing should the court . . . You could have made inevitable discovery as an argument at that hearing. We had the phone, Your Honor. We had the phone. I could have made such an argument at such a hearing. However . . . What's your view now, then, about that? Do you still feel there should have been a hearing or no? The question presented as to whether or not there should have been a hearing is a little different from the standard of review applicable to the suppression question in direct, which is that would be a de novo review. Here, on the decision to hold a suppression hearing, it's up to this court's determination as to whether that was an abuse of discretion, and while the government was certainly prepared to hold a hearing, I don't believe there are sufficient facts in the record to conclude that it was an abuse of the district court's discretion. Did the defendant ask for a hearing? I believe the defendant did request a hearing, Your Honor. So that was effectively denied or just not acted on? Either way, it was effectively denied. There was no hearing held. You were speaking about the record before in response to Judge Pooler's questions, and I wanted to just make sure I understand this. The search warrant, it's not appended to your brief, is it? Where is the search warrant? I believe the search warrant is appended. If I may have just a moment, Your Honor. I believe it is in our appendix. Yes, it's government's appendix. One is the application, and the warrant itself begins at 15. The appendix to the government's brief. The appendix to the government's brief. It was filed, I believe, on the docket in the same PDF, so it appears in the same. It should appear in the same. In the red brief, right? Correct, Your Honor. In the red brief. Okay. I have some questions about that. So aren't we effectively supplementing the record on appeal? That is, why is it being done? It goes to the question of inevitable discovery, I guess. This was all before the district court? The search warrant certainly was. The defendant did not move to suppress it. I would also add that during the course of Inspector Belfort's testimony, the government introduced both the device itself, as well as a limited printout of the results of the examination of that device for the sole purpose of identifying the telephone number assigned. But the affidavit in support of the search warrant recounts his identification in his interview of that number. That's correct, Your Honor. That's an important part of the search warrant application. Would you agree? It is. Certainly. The defendant's admission of his telephone number is an important part of the case that I don't believe the government has any dispute about that. It's an important part of the search warrant application and affidavit in support of the search warrant application. It's certainly added to the quantum of probable cause in the application. However, it only appears in one paragraph, and there are numerous references drawn from the bank records that identify that telephone number as appearing on multiple either applications for credit card accounts and other person's names, or upon the call records of when the credit card company would receive a call inquiring about the account, that number appeared. The commonality of the appearance of that number across those multivariate accounts is something that stood out to the investigators and would have stood out to them in the absence of the defendant's admission that it was his telephone number. All of that is a long way to say, based on the search warrant, we know what happened in this case because we have a search warrant and the results of that search warrant were introduced at trial. The government might be taking a longer walk to get to that result, but the government gets to the result that this telephone number is associated with this defendant inevitably. Now, why don't you address my earlier concern with Ms. Glashauser. If she prevails before us, what would the situation be? I understand it's a hypothetical in large measure, but how would that affect his fate and your prosecutorial stance? Well, if this court were to remand for a suppression hearing . . . Yes, the hypothetical is that Ms. Glashauser obtains whatever it is she's asking for. If this court were to vacate the judgment, the government would have to retry this case without the benefit of the defendant's admission of his telephone number. I think it's important to note that the defense did not challenge below, nor have they challenged here, numerous other admissions that the defendant made during the course of that booking interview that the government used at trial, particularly in summation, to highlight his lack of candor and therefore his consciousness of guilt. All right, so let's limit it to exactly what's before us, this particular inquiry as to which his counsel objects in this appeal. So that's the hypothetical. She prevails. Ms. Glashauser prevails completely. What's the prosecutorial stance at that point? The government would have the option to retry the case with the exception of one count on which the jury acquitted. I anticipate fully that the government would seek to retry that case, and I'm confident that we would win that case, notwithstanding that we're not raising a harmless error argument here because the record fairly supports that the government viewed this as important evidence before the jury. The quantum of evidence identifying the defendant by an eyewitness, the defendant's appearance on multiple items of surveillance video at multiple places, multiple dates, we would certainly have enough evidence to go to trial. What about the thing that cracked the case wide open? Again, I would contend there is some nuance in that. It's the association of the telephone number with the defendant that cracked the case wide open, and certainly the defendant's admission in a pedigree interview after having made multiple uncanny statements that that was his telephone number got the government to that result much more quickly, but the government gets there in the end. But help me follow my hypothetical, if you would. So it's back to the district court, and you're prepared to, under this hypothetical, to pursue a prosecution of Mr. Duren. What, in your view, would be his exposure in those circumstances? Were he to be convicted in this putative, hypothetical trial? He would face the same counts, with the one exception I highlighted. I do not believe there would be a—I don't know if the sentencing guidelines have changed. If they change to his benefit, then he would have the benefit. If they change to his detriment, that would potentially present an ex post facto problem. It's a long way of saying, I don't—standing here now, I'm not thinking of a detrimental change to his status. Other than perhaps— He would get credit if he were convicted again and re-sentenced for any time he served on this first conviction, wouldn't he? I would imagine he would get credit for that time, yes, Your Honor. Do you know how many months of his term he served? He was taken into custody at the taking of the verdict, which I believe was June or July of 2016. So he served approximately 30 months, more than half of the sentence imposed. Perhaps more than two-thirds if one assumes the traditional good time credit. If the panel has no further questions— Thank you. Thank you, Your Honors. To address some of the questions about inevitable discovery, I think there are a number of ways that the Court can find this wasn't inevitable, but one that hasn't been mentioned is that the only reason the government thought that this particular phone with this particular number—the only reason they had that number to put in the search warrant and say this number is associated with all of this other stuff that we have probable cause about was Mr. Duran's statement. Without that statement, it's not even clear they would have taken his phone, that they would have had probable cause to seek a search warrant to the phone because they did not know what number was on it. So it's pure speculation to say they would have found this out anyway. The other thing I'd like to address is the government's suggestion that this would somehow be a novel ruling from the Court. The Court's ruling in our favor would follow very clear precedent that Miranda is required before questions that are designed to elicit an interrogating response. That's what we have here. There's a narrow exception for booking, and the government relies heavily on ROSA, but in ROSA, the officers were filling out an online booking sheet. They were sitting in front of a computer, asking questions and entering in the answers in the order that they appeared on the booking sheet. That is not the circumstance. I thought in ROSA, though, that the victim the previous day had said the person had—the they found him the next day, he had totally blonde hair, and that's why they kind of pressed him on it, because those were the same detectives that took the statement the day before from the victim who said that was the color of his hair. I would say you would argue it's more similar to here, where they knew this number had some significance ahead of time, just like his hair color had significance other than, what's your hair color? I don't believe that's true in ROSA, because I believe it's the interpreter who's asking the question, who is not the agent that knew anything about the case. It's the Spanish interpreter. It's my understanding. I could be misremembering— It was a Spanish-speaking officer who was doing it, one of the two detectives, no? I could be misremembering that, but in ROSA, it's a question on the standard form, and he's going through that form, and that's not what we have here. There's no form. There's no standard paperwork that's being filled out, and telephone numbers are also not something that are part of the normal pedigree information, and it's not because of cell phones. People had telephone numbers before they had cell phones. This isn't a novel thing. It's not in the list of standard questions that— If they develop a form, as they do for Miranda, if they develop a form for future use and include the telephone of the person, you'd have no problem, in theory, with that. Well, and he was being questioned as part of his booking and processing, and the investigators in the case had no reason to think that the questioning of this particular person would elicit an incriminating response. Maybe. Thanks very much. Thank you. We'll reserve the decision.